## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARLES GAUDREAULT, Derivatively on Behalf of iROBOT CORPORATION, | Case No.: |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| GARY COHEN, KAREN GOLZ, MICHAEL LOPARCO, EVA MANOLIS, ANDREW MILLER, JULIEN MININBERG, MICHELLE STACY, GLEN D. WEINSTEIN, RUEY-BIN KAO, KARIAN WONG, and JULIE ZEILER, | |
| Defendants, | |
| and | |
| iROBOT CORPORATION, | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Charles Gaudreault ("Plaintiff"), by and through Plaintiff's undersigned counsel,

derivatively on behalf of Nominal Defendant iRobot Corporation ("iRobot" or the "Company"),

brings this Verified Shareholder Derivative Complaint against Gary Cohen ("Cohen"), Karen Golz

("Golz"), Michael Loparco ("Loparco"), Eva Manolis ("Manolis"), Andrew Miller ("Miller"),

Julien Mininberg ("Mininberg"), Michelle Stacy ("Stacy"), Glen D. Weinstein ("Weinstein"),

Ruey-Bin Kao ("Kao"), Karian Wong ("Wong"), and Julia Zeiler ("Zeiler") (collectively, the

"Individual Defendants" and, together with iRobot, "Defendants") for and among other things,

their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by iRobot with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, filings in the securities class action captioned *Vinayak Savant v. iRobot Corporation, et al.*, Case No. 1:25-cv-05563-JHR (S.D.N.Y) (the "Securities Class Action"), and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a shareholder derivative action brought against certain current and former iRobot officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between January 29, 2024 and March 11, 2025, inclusive (the "Relevant Period").

2.       iRobot designs, builds, and sells robots and home innovation products. The Company's portfolio of home robots and smart home devices features proprietary technologies for cleaning, mapping and navigation. iRobot is primarily known for its products sold under the "Roomba" brand name.

3.       iRobot's Roomba was the first commercially successful RVC, however, in the past decade, iRobot's business has steadily declined. Competitors were able to undercut the luxury-priced Roomba, while other consumer electronics firms like Samsung and SharkNinja introduced their own RVCs. By 2016, iRobot's market share had dropped to 64%. By 2020 is was only 46%.

4.      In August 2022, iRobot's fortunes appeared to be turning when Amazon.com, Inc. ("Amazon") agreed to acquire the Company (the "Amazon Acquisition"). The announcement of the Amazon Acquisition began to restore investor confidence in the Company.

5.      However, in January 2024, Amazon and iRobot announced that the Amazon Acquisition had been terminated due to regulatory concerns. At the same time, iRobot announced that Colin Angle would be stepping down as Chief Executive Officer ("CEO") and that the Company would be laying off approximately 350 employees, or about 31% of its workforce.

6.      Despite announcing the termination of the Amazon Acquisition, the Company assured investors that it was undergoing a significant operational restructuring plan which would stabilize the business, enabling "sustainable value creation" and promoting iRobot's ability to operate "successfully as a standalone company."

7.      Despite these assurances, the Company would ultimately reveal in March 2025 that, due to "uncertainties and the implication they may have on the Company's financials, there is substantial doubt about the Company's ability to continue as a going concern."

8.      On this news, the price of iRobot stock declined more than 51% over the following two days, from a closing price of $6.31 per share on March 11, 2025 to a closing price of $3.06 per share on March 13, 2025.

9.      During the Relevant Period, the Individual Defendants made and/or caused the Company to make false and misleading statements and to fail to disclose that: (1) the Company overstated the effectiveness of its restructuring plan in preserving the Company's stability following the termination of the Amazon Acquisition; (2) following the termination of the Amazon Acquisition, the Company was unlikely to sustain profitable operations; and (3) as a result, there

existed significant doubt as to its ability to continue as a going concern. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

10.     As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Weinstein, Cohen, Zeiler, and Wong on July 7, 2025 in the United States District Court for the Southern District of New York.

11.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims asserted herein raise a federal question under Section and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and SEC Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

14.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

16.    Plaintiff is a current shareholder of iRobot and has continuously held iRobot common stock at all relevant times.

17.    Nominal Defendant iRobot is incorporated under the laws of Delaware and its principal executive offices are located at 8 Crosby Drive, Bedford, Massachusetts, 01730. The Company's common stock trades on Nasdaq under the symbol "IRBT."

18.    Defendant Cohen has served as a Company director and as the Company's CEO since May 2024. According to the proxy statement filed on Schedule 14A with the SEC on March 31, 2025 (the "2025 Proxy Statement"), in 2024, Defendant Cohen received $6,980,075 in total compensation from the Company.

19.    Defendant Golz has served as a Company director since November 2021. Defendant Golz also serves as Chair of the Board's Audit Committee. According to the 2025 Proxy Statement, in 2024, Defendant Golz received $299,997 in total compensation from the Company.

20.    Defendant Loparco has served as a Company director since August 2024. Defendant Loparco also serves as a member of the Board's Compensation and Talent Committee. According to the 2025 Proxy Statement, in 2024, Defendant Loparco received $191,307 in total compensation from the Company.

21.    Defendant Manolis has served as a Company director since July 2019. Defendant Manolis also serves as Chair of the Board's Nominating and Corporate Governance Committee. According to the 2025 Proxy Statement, in 2024, Defendant Manolis received $290,304 in total compensation from the Company.

22.    Defendant Miller has served as a Company director since September 2016 and as Chairman of the Board since January 2024. Defendant Miller also serves as a member of the

Board's Audit Committee and its Nominating and Corporate Governance Committee. According to the 2025 Proxy Statement, in 2024, Defendant Miller received $347,465 in total compensation from the Company.

23.     Defendant Mininberg has served as a Company director since June 2024. Defendant Mininberg also serves as a member of the Board's Audit Committee and its Compensation and Talent Committee. According to the 2025 Proxy Statement, in 2024, Defendant Mininberg received $238,594 in total compensation from the Company.

24.     Defendant Stacy has served as a Company director since August 2014. Defendant Stacy also serves as Chair of the Board's Compensation and Talent Committee and as a member of its Nominating and Corporate Governance Committee. According to the 2025 Proxy Statement, in 2024, Defendant Stacy received $299,997 in total compensation from the Company.

25.     Defendant Weinstein served as the Company's Chief Legal Officer from August 2012 until January 2024 and as the Company's Interim CEO from January 2024 until May 2024. According to the 2025 Proxy Statement, in 2024, Defendant Weinstein received $3,349,517 in total compensation from the Company.

26.     Defendant Kao served as a Company director from June 2018 until May 2025. According to the 2025 Proxy Statement, in 2024, Defendant Kao received $281,247 in total compensation from the Company.

27.     Defendant Wong has served as the Company's Chief Financial Officer ("CFO") since December 2024. According to the 2025 Proxy Statement, in 2024, Defendant Wong received $2,934,414 in total compensation from the Company.

28.     Defendant Zeiler served as the Company CFO from May 2020 until December 2024, and as an advisor to the CFO until March 2025. According to the 2025 Proxy Statement, in

2024, Defendant Zeiler received $1,868,824 in total compensation from the Company.

29.    Defendants Weinstein, Golz, Kao, Manolis, Miller, and Stacy are herein referred to as the "Proxy Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

30.    By reason of their positions as officers, directors, and/or fiduciaries of iRobot and because of their ability to control the business and corporate affairs of iRobot, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

31.    Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

32.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information

about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

33.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations;

and

       (f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

34.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## THE CODE OF BUSINESS CONDUCT AND ETHICS

35.    iRobot maintains a Code of Business Conduct and Ethics (the "Code of Conduct"), which states that the purpose of the Code of Conduct is to " aid the Company's directors, employees and contractors in making ethical and legal decisions when conducting the Company's business and performing their day-to-day duties."

36.    In an opening letter from the Company's former Chairman and CEO, the Code of Conduct states that "[e]ach director, employee and contractor has a personal responsibility to ensure that his or her conduct protects and promotes both the letter of the Code and its spirit of ethical conduct."

37.    In a section titled "Compliance with Laws, Rules and Regulations", the Code of Conduct provides the following, in relevant part:

iRobot seeks to conduct its business in compliance with both the letter and the spirit of applicable laws, rules and regulations. The Company also seeks partners, distributors, manufacturers, suppliers, contractors and customers who comply with all applicable laws, rules and regulations. No director, employee or contractor shall engage in any unlawful activity in conducting the Company's business or in performing his or her day-to-day company duties, nor shall any director, employee or contractor instruct others to do so.

* * *

It is our policy to comply with all applicable laws in the countries in which we do business. If business conduct in certain countries is less restrictive than that outlined in this Code (or our policies), the Code should be followed. When in doubt, please contact the Legal Department. It is our policy to cooperate fully with all federal, state, and local investigations conducted by various governmental agencies in each country in which we do business. Employees and contractors have a responsibility to cooperate with an investigation about which they may have information, and all investigations should be handled in a confidential, forthright manner. Compliance with the law does not comprise our entire ethical responsibility; it is a minimum condition for performance of our work.

38.     In a section titled "Protection and Proper Use of the Company's Assets", the Code of Conduct provides the following:

Loss, theft, waste and misuse of iRobot's assets have a direct impact on the Company's business and its profitability. Directors, employees and contractors are expected to protect the Company's assets – such as electronic communications systems, information resources, material, facilities and equipment – that are entrusted to them and to protect the Company's assets in general. Company property, including items discarded by the Company as scrap, may not be taken or used for personal benefit.

Directors, employees and contractors are also expected to take steps to ensure that the Company's assets are used only for legitimate business purposes and to protect against waste and theft. It is recognized, however, that occasional personal use of equipment by directors, employees and contractors may occur without adversely affecting the interests of the Company.

39.     In a section titled "Fair Dealing", the Code of Conduct provides the following, in relevant part:

Competing vigorously, yet lawfully, with competitors and establishing advantageous, but fair, business relationships with customers and suppliers is a part

of the foundation for long-term success. Unlawful and unethical conduct, which may lead to short-term gains, may damage a company's reputation and long-term business prospects. Accordingly, it is the Company's policy that directors, employees and contractors must endeavor to deal ethically and lawfully with the Company's customers, suppliers, competitors and employees in all business dealings on the Company's behalf. No director, employee and contractor should take unfair advantage of another person in business dealings on the Company's behalf through the abuse of privileged or confidential information or through improper manipulation, concealment or misrepresentation of material facts.

40.    In a section titled "Accuracy of Records", the Code of Conduct provides:

The integrity, reliability and accuracy in all material respects of the Company's books, records and financial statements are fundamental to iRobot's continued and future business success.

Transactions between the Company and outside individuals and organizations should be promptly and accurately entered in the Company's books in accordance with generally accepted accounting practices and principles, including accurate recording of all labor and material costs (including contract work, internal research and development, and bid and proposal work). No director, employee or contractor may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no director, employee or contractor may create any false or artificial documentation or book entry for any transaction entered into by the Company. Similarly, officers and employees who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets and transactions on the Company's books and records.

41.    In a section titled "Quality of Public Disclosures", the Code of Conduct provides

the following, in relevant part:

The Company is committed to providing its stockholders with complete and accurate information about its financial condition and results of operations as required by the securities laws of the United States. It is the Company's policy that the reports and documents it files with or submits to the Securities and Exchange Commission, and its earnings releases and similar public communications made by the Company, include fair, timely and understandable disclosure. Officers and employees who are responsible for these filings and disclosures, including the Company's principal executive, financial and accounting officers, must use reasonable judgment and perform their responsibilities honestly, ethically and objectively in order to ensure that this disclosure policy is fulfilled. The Company's senior management is primarily responsible for monitoring the Company's public disclosures.

42.     In a subsection titled "Monitoring Compliance and Disciplinary Action," the Code of Conduct provides the following:

> The Company's management, under the supervision of its Board of Directors or a committee thereof or, in the case of accounting, internal accounting controls or auditing matters, the Audit Committee, will take reasonable steps from time to time to (i) monitor and audit compliance with the Code, and (ii) when appropriate, impose and enforce appropriate disciplinary measures for violations of the Code. Disciplinary measures for violations of the Code may include, but are not limited to, counseling, oral or written reprimands, warnings, probation or suspension with or without pay, demotions, reductions in salary, termination of employment or service and restitution.

> The Company's management shall periodically report to the Board of Directors or a committee thereof on these compliance efforts including, without limitation, periodic reporting of alleged violations of the Code and the actions taken with respect to any such violation.

## THE AUDIT COMMITTEE CHARTER

43.     The Company also maintains an Audit Committee Charter (the "Charter"), which states that the purpose of the Audit Committee is to:

- oversee the accounting and financial reporting processes of the Company and the audits of the Company's financial statements;

- take, or recommend that the Board of Directors of the Company (the "Board") take, appropriate action to oversee the qualifications, independence and performance of the Company's independent auditors;

- prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement;

- oversee the Company's compliance with legal and regulatory requirements; and

- oversee the internal audit function of the Company to ensure compliance with accounting, financial reporting, legal or other regulatory requirements.

44.     In a section titled "Responsibilities and Authority", the Charter provides the following, in relevant part:

### C. Matters Relating to Selection, Performance and Independence of Independent Auditor

- The Audit Committee shall be directly responsible for the appointment, retention and termination, and for determining the compensation, of the Company's independent auditor engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company. The Audit Committee may consult with management in fulfilling these duties.

- The Audit Committee shall be directly responsible for oversight of the work of the independent auditor (including resolution of disagreements between management and the independent auditor regarding financial reporting) engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company.

- The Audit Committee shall instruct the independent auditor that the independent auditor shall report directly to the Audit Committee.

- The Audit Committee shall pre-approve all auditing services and the terms thereof and non-audit services to be provided to the Company by the independent auditor; provided, however, the pre-approval requirement is waived with respect to the provision of non-audit services for the Company if the "de minimus" provisions of Section 10A(i)(1)(B) of the Exchange Act are satisfied. This authority to pre-approve non-audit services may be delegated to one or more members of the Audit Committee, who shall present all decisions to pre-approve an activity to the full Audit Committee at its first meeting following such decision. The Audit Committee shall review and approve the scope and staffing of the independent auditors' annual audit plan(s).

- The Audit Committee shall (1) request that the independent auditor provide the Audit Committee with the written disclosures and the letter required by Public Company Accounting Oversight Board (the "PCAOB") Rule 3526 ("Rule 3526"), (2) require that the independent auditor submit to the Audit Committee at least annually a formal written statement describing all relationships between the independent auditor or any of its affiliates and the Company or persons in financial reporting oversight roles at the Company that might reasonably be thought to bear on the independence of the independent auditor, (3) discuss with the independent auditor the potential effects of any disclosed relationships or services on the objectivity and independence of the independent auditor, (4) require that the independent auditor provide to the Audit Committee written affirmation that the independent auditor is, as of the date of the affirmation, independent in compliance with PCAOB Rule 3520 and (5) based on such disclosures, statement, discussion and affirmation (and such other matters as the Audit Committee deems relevant), take or recommend that the Board take appropriate action in response to the independent auditor's report to satisfy itself of the independent auditor's independence. In addition, before approving the initial engagement of any independent auditor, the Audit Committee shall

13

receive, review and discuss with the audit firm all information required by, and otherwise take all actions necessary for compliance with the requirements of, Rule 3526. References to rules of the PCAOB shall be deemed to refer to such rules and to any substantially equivalent rules adopted to replace such rules, in each case as subsequently amended, modified or supplemented.

- The Audit Committee shall evaluate the independent auditors' qualifications, performance and independence, and shall present its conclusions with respect to the independent auditors to the full Board. As part of such evaluation, at least annually, the Audit Committee shall:

    (i) obtain and review a report or reports from the independent auditor describing (1) the auditor's internal quality-control procedures, (2) any material issues raised by the most recent internal quality-control review or peer review of the auditors or by any inquiry or investigation by government or professional authorities, within the preceding five years, regarding one or more independent audits carried out by the auditors, and any steps taken to address any such issues, and (3) in order to assess the auditor's independence, all relationships between the independent auditor and the Company;

    (ii) review and evaluate the performance of the independent auditor and the lead partner (and the Audit Committee may review and evaluate the performance of other members of the independent auditor's audit staff);

    (iii) assure the regular rotation of the audit partners (including, without limitation, the lead and concurring partners) as required under the Exchange Act and Regulation S-X; and

    (iv) review results and consider impact from the PCAOB's most recent annual inspection report available for the independent auditor.

    In this regard, the Audit Committee shall also (1) seek the opinion of management and the internal auditors of the independent auditors' performance and (2) consider whether, in order to assure continuing auditor independence, there should be regular rotation of the audit firm.

- The Audit Committee may recommend to the Board policies with respect to the potential hiring of current or former employees of the independent auditor.

### D. Audited Financial Statements and Annual Audit

- The Audit Committee shall review the overall audit plan (both internal and external) with the independent auditor and the members of management who are responsible for preparing the Company's financial statements, including the Company's Chief Financial Officer and/or principal accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to herein collectively as the "Senior Accounting Executive").

- The Audit Committee shall review and discuss with management (including the Company's Senior Accounting Executive) and with the independent auditor the Company's annual audited financial statements, including (1) all critical accounting policies and practices used or to be used by the Company, (2) the Company's disclosures under "Management's Discussion and Analysis of Financial Conditions and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements, including any significant, non-routine transactions or judgments.

- The Audit Committee must review:

  (i)    any analyses prepared by management, the internal auditors and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements. The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the independent auditor. The Audit Committee will also consider other material written communications between the registered public accounting firm and management, such as any management letter or schedule of unadjusted differences;

  (ii)   major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of any material control deficiencies;

  (iii)  major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

  (iv)   the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

- The Audit Committee shall review and discuss with the independent auditor (outside of the presence of management) how the independent auditor plans to handle its responsibilities under the Private Securities Litigation Reform Act of 1995, and request assurance from the auditor that Section 10A of the Private Securities Litigation Reform Act of 1995 has not been implicated.

- The Audit Committee shall review and discuss with the independent auditor any audit problems or difficulties and management's response thereto. This review shall include (1) any difficulties encountered by the auditor in the course of performing its audit work, including any restrictions on the scope of its activities or its access to information, (2) any significant disagreements with

management and (3) a discussion of the responsibilities, budget and staffing of the Company's internal audit function.

- The Audit Committee shall discuss with the independent auditors those matters brought to the attention of the Audit Committee by the auditors pursuant to Statement on Auditing Standards No. 61, as amended ("SAS 61").

- The Audit Committee shall also review and discuss with the independent auditors the report required to be delivered by such auditors pursuant to Section 10A(k) of the Exchange Act.

- As brought to the attention of the Audit Committee, the Audit Committee shall discuss with the Chief Executive Officer and Chief Financial Officer of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

- Based on the Audit Committee's review and discussions (1) with management of the audited financial statements, (2) with the independent auditor of the matters required to be discussed by SAS 61, and (3) with the independent auditor concerning the independent auditor's independence, the Audit Committee shall make a recommendation to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K for the last fiscal year.

- The Audit Committee shall prepare the Audit Committee report required by Item 407(d) of Regulation S-K of the Exchange Act (or any successor provision) to be included in the Company's annual proxy statement.

**E. Unaudited Quarterly Financial Statements**

- The Audit Committee shall discuss with management and the independent auditor, prior to the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and the Company's related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) such issues as may be brought to the Audit Committee's attention by the independent auditor pursuant to Statement on Auditing Standards No. 100, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such financial statements.

**F. Earnings Press Releases**

- The Audit Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and

rating agencies, including, in general, the types of information to be disclosed and the types of presentation to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

## G. Risk Assessment and Management

- The Audit Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management.

- In connection with the Audit Committee's discussion of the Company's risk assessment and management guidelines, the Audit Committee shall discuss or consider the Company's major financial risk exposures and the steps that the Company's management has taken to monitor and control such exposures, including periodic review of the Company's investment policy

- The Audit Committee shall review and approve the corporation's foreign exchange exposure management policy, including but not limited to its entering into swaps thereunder, and the exemption of swaps from any execution and clearing requirements

- The Committee shall review and, when appropriate, make recommendations to the Board regarding, the Company's cash investments, cash management, interest rate, currency risk management policies and other treasury policies.

- The Committee shall periodically review and make recommendations to the Board regarding any Company authorization to repurchase its common stock, approve any actions taken under each such plan, and monitor actual repurchases under any such repurchase authorization.

- The Committee shall review and, when appropriate, make recommendations to the Board regarding, the Company's financing and capital structure objectives, strategies and plans, including issuing and redeeming debt and equity.

- The Committee shall review with management the Company's tax structure and strategies and approve, or when appropriate recommend that the Board approve, material changes to the Company's tax structure.

- The Audit Committee shall periodically discuss with management results of risk assessments and compliance with policies for risk management with respect to cybersecurity and data protection, including direct oversight of the data protection officer as appropriate.

## H. Oversight of Internal Audit Function

- The Audit Committee shall have functional oversight of the internal auditors, including: (1) authority to review and approve the annual internal audit plan and periodic changes, if any; (2) oversight of the appointment, replacement or dismissal of the head of internal audit; (3) review and approval of the annual performance appraisal of the head of internal audit; and (4) periodic review of

the effectiveness of the internal auditors, the internal audit charter and staffing. In performing its oversight responsibilities, the Audit Committee shall periodically meet outside the presence of management with the head of internal audit.

37. In a section titled "Additional Authority", the Charter provides the following, in relevant part:

**A. Engagement of Advisors**

- The Audit Committee shall have the authority to engage independent counsel and such other advisors it deems necessary or advisable to carry out its responsibilities and powers, and, if such counsel or other advisors are engaged, shall determine the compensation or fees payable to such counsel or other advisors.

**B. Legal and Regulatory Compliance**

- The Audit Committee shall discuss with management and the independent auditor, and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements. After these discussions, the Audit Committee may, if it determines it to be appropriate, make recommendations to the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations.

- The Audit Committee shall discuss with management legal matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its compliance policies and procedures.

## THE CORPORATE GOVERNANCE GUIDELINES

45. The Company also maintains Corporate Governance Guidelines (the "Guidelines"), which state that they are intended to "assist and guide the Board in the exercise of its responsibilities."

46. In a section titled "Director Responsibilities", the Guidelines provide the following:

Role of Directors: The business and affairs of the Company are managed by or under the direction of the Board, acting on behalf of the stockholders. The Board has delegated to the officers of the Company the authority and responsibility for managing the Company's everyday affairs. The Board has an oversight role and is not expected to perform or duplicate the tasks of the CEO or senior management.

47.    In a section titled "Director Access to Management and Independent Advisors", the

Guidelines provide the following:

> In carrying out its responsibilities, the Board, and each committee thereof, shall be
> entitled to rely on the advice and information that it receives from management and
> such experts, advisors and professionals with whom the Board, or any such
> committee, may consult. The Board, and each committee thereof, shall have the
> authority to request that any officer or employee of the Company, the Company's
> outside legal counsel, the Company's independent auditor or any other professional
> retained by the Company to render advice to the Company, attend a meeting of the
> Board, or such committee, or meet with any members of or advisors to the Board.
> The Board or any committee thereof shall also have the authority to engage legal,
> accounting or other advisors to provide it with advice and information in connection
> with carrying out its or their responsibilities.

## SUBSTANTIVE ALLEGATIONS

### *Materially False and Misleading Statements Issued During the Relevant Period*

48.    The Relevant Period begins on January 29, 2024, when iRobot issued a press

release announcing that the Amazon Acquisition had been terminated:

> "iRobot is an innovation pioneer with a clear vision to make consumer robots a
> reality," said Colin Angle, Founder of iRobot. "The termination of the agreement
> with Amazon is disappointing, but iRobot now turns toward the future with a focus
> and commitment to continue building thoughtful robots and intelligent home
> innovations that make life better, and that our customers around the world love."

49.    That same day, iRobot issued another press release, titled "iRobot Announces

Operational Restructuring Plan to Position Company for the Future," (the "Restructuring Plan

Press Release") which stated the following, in relevant part:

> Today, iRobot [. . .] announced that it will implement an operational restructuring
> plan designed to position the Company for stabilization in the current environment,
> while focusing on profitability and advancing key growth initiatives to extend its
> market share in the mid-tier and premium segments. This plan was approved
> following iRobot's and Amazon's mutual decision to terminate their previously
> announced merger agreement.

\* \* \*

19

iRobot's immediate priority in undertaking the operational restructuring plan is to more closely align its cost structure with near-term revenue expectations and drive profitability, including through the following financial and strategic initiatives:

•       Achieving margin improvements and generating approximately $80-$100 million in savings on equivalent volumes through the execution of agreements with joint design and contract manufacturing partners on more attractive terms that provide significant reductions in cost of goods sold;

•       Reducing R&D expense by approximately $20 million year-over-year through increased offshoring of non-core engineering functions to lower- cost regions;
•       Centralizing global marketing activities and consolidating agency expenditures to reduce sales and marketing expenses by approximately $30 million year-over-year while seeking efficiencies in demand generation activities to drive sales more cost effectively;

•       Rightsizing the Company's global real estate footprint through additional subleasing at its corporate headquarters and the elimination of offices and facilities in smaller, underperforming geographies; and

•       Focusing iRobot's product roadmap on core value drivers and pausing all work related to non-floorcare innovations, including air purification, robotic lawn mowing and education.

*  *  *

The Company will continue executing key strategic activities to support iRobot's return to profitability, including increasing its brand recognition, driving product innovation and redesigning its go-to-market strategy. Enhancements to the Company's go-to-market playbook will focus the business on iRobot's most profitable customers, geographies and channels, including its growing direct-to-consumer channel, while rebalancing the Company's spending mix between price, promotion and demand generation to optimize returns.

Andrew Miller, Chairman of the Board, said, "iRobot is a pioneer of the consumer robot field and beloved by its customers around the world. With a legacy of innovation and a foundation of creativity, the Board and I believe that iRobot can – and will – grow its presence and continue to build a cutting-edge suite of robotic floorcare solutions that help consumers make their homes easier to maintain and healthier places to live. To do this successfully, however, we must rapidly align our operating model and cost structure to our future as a standalone company. Though decisions that impact our people are difficult, we must move forward with a more sustainable business model, and a renewed focus on profitability. We are confident

that the actions we are announcing today will enable us to chart a new strategic path for sustainable value creation."

50.     On February 26, 2024, iRobot issued a press release announcing its financial results for the fourth quarter and full year 2023, stating the following, in relevant part:

"As we shared last month, we are actively implementing an operational restructuring plan designed to both stabilize the business in the current environment and advance our growth initiatives," said [Defendant] Weinstein[.] "The plan will simplify our cost structure, create a more sustainable business model, and enable us to focus on our core value drivers. As we move forward with urgency and focus, our management team and Board are confident in iRobot's ability to build on our innovation and to navigate this period successfully as a standalone company."

"We are managing through a challenging period and making critical strategic progress that we believe will help expand and better position our business for the future," added [Defendant] Weinstein. "We are confident that the actions we are taking today will drive improved performance going forward."

51.     On February 27, 2024, the Company filed an annual report on Form 10-K with the SEC (the "2023 Form 10-K"). The 2023 Form 10-K was signed by Defendants Weinstein, Miller, Zeiler, Wong, Ali, Golz, Kao, Manolis, and Stacy. Appended to the 2023 Form 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Weinstein and Zeiler, attesting to the accuracy of the statements contained therein.

52.     The 2023 Form 10-K repeated substantially similar statements regarding the Company's restructuring plan to those identified above in the Restructuring Plan Press Release.

53.     That same day, the Company hosted an earnings call with investors and analysts to discuss the Company's fourth quarter 2023 financial results. During the call, Defendant Weinstein stated the following, in relevant part:

Our future is different than we had envisioned in August of 2022 or even at the start of this year, given the decision by iRobot and Amazon to terminate our transaction. The management team and Board are confident in our ability to build on our legacy of innovation as a standalone company and to navigate this period successfully.

As we shared on January 29th, we are taking aggressive action to significantly improve our near-term operations. To that end, today, I'm going to outline the tenets of the restructuring plan we announced last month.

\* \* \*

The operational restructuring plan we announced last month is designed to stabilize the business in our current environment, while also advancing our longer-term growth initiatives. The operational restructuring plan is centered around simplifying our cost structure, implementing a more sustainable business model, and focusing on our core value drivers. Those core value drivers are: first, leverage our brand and innovative products to extend or reclaim our leadership in the mid and premium segments; and second, focus on geographies that offer the greatest scale and profitability.

Our immediate priorities in executing this plan are to more closely align our cost structure with near-term revenue expectations, improve liquidity and drive bottom-line improvements. Specifically, the plan is structured to: first, achieve gross margin improvements through a focus on design to value and removal of unnecessary costs and more attractive terms with our manufacturing partners; second, reduce R&D expenses by relocating certain non-core engineering functions, including increasing reliance on third-parties to provide those functions and pausing work unrelated to our core floorcare business; third, centralize our global marketing activities to be more efficient in demand generation and provide a meaningful reduction in non-working marketing and agency fees; and fourth, streamline our legal entity and real-estate footprint to fit our current business needs and near-term revenue expectations.

\* \* \*

As we've outlined, we have a plan in place to simplify our cost structure, implement a more sustainable business model, and focus on our core value drivers of leveraging our brand and innovative products to regain and extend our leadership across segments and geographies. Coupled with the restructuring actions we announced, we believe our second half 2024 performance will serve as a springboard for our -- driving our future.

54.     On May 7, 2024, iRobot issued a press release announcing its financial results for the first quarter of 2024, stating the following, in pertinent part:

"We exceeded our financial expectations for the first quarter as our team executed on our restructuring plan to significantly improve iRobot's near-term operations," said [Defendant] Weinstein[.] "Our plan is designed to stabilize the business in the current market environment without sacrificing longer-term growth initiatives. In

the first quarter, we took aggressive actions to simplify our cost structure, implement a more sustainable business model and focus on our core value drivers.["]

55.    The following day, May 8, 2024, the Company hosted an earnings call to discuss

first quarter 2024. During the call, Defendant Weinstein stated the following:

> We took aggressive action in Q1 to implement our restructuring plan to significantly improve our near-term operations. On today's call, I'll share with you the progress we have made with key elements of the plan and discuss what you can expect from iRobot moving forward. With the successes we achieved in the first quarter, and with a new CEO in place, we are all the more confident in our iRobot's ability to build on our legacy of innovation.
>
> * * *
>
> Operationally, Q1 represented an important first step with respect to our restructuring plan. The plan is designed to stabilize the business in the current market environment without sacrificing longer-term growth initiatives. We are committed to simplifying our cost structure, implementing a more sustainable business model and concentrating on our core value drivers. We are leveraging our brand and innovative products to extend or reclaim leadership positions in the mid and premium market segments as well as leveraging our new product launches that balance price point and cost to participate more fully in the entry market segment. In addition, we are focused on geographies that offer the greatest scale and profitability.
>
> * * *
>
> In short, we have an iconic brand that people are passionate about, and we have great products. About 5 weeks ago, consumer reports released its 2024 guide to robotic vacuums. iRobot products held all 5 top positions and 7 of the top 8 rated robots with new models coming and our focused marketing driving sales at key retailers and online we believe we are well positioned to stabilize the business. The first quarter represented an important step in iRobot's journey, and we are proud of the way that it was able to deliver on the promises we outlined previously.

56.    On August 6, 2024, iRobot issued a press release announcing its financial results

for the second quarter of 2024, stating the following, in relevant part:

> "We are executing iRobot Elevate, a strategy focused on five pillars of financial performance, customer-centricity, bringing innovative products to market in an entirely new and more profitable way, continuing our operational and organization

23

improvements, and developing and retaining our best talent," said [Defendant] Cohen[.] "We are elevating everything we do at iRobot to improve our performance and generate long-term shareholder value.

"In the second quarter, we made significant progress, specifically in lowering the Company's cost structure through aggressive restructuring efforts. As part of our iRobot Elevate strategy, we strengthened our balance sheet, narrowed our operating loss, decreased headcount, and substantially reduced inventory. Without a nonrecurring charge related to the write-off of excess component inventory and the losses on non-cancelable purchase commitments as part of the transition to our new product development paradigm with our contract manufacturers, we would have met our Q2 improvement targets for gross margin, operating loss, and net loss per share.

* * *

"Looking ahead, I am confident we can capitalize on our iconic brand with a renewed consumer-centric emphasis and a sharply focused innovation and product roadmap to advance our growth initiatives and deliver long-term shareholder value."

57.    The following day, August 7, 2024, the Company hosted an earnings call to discuss

second quarter 2024. During the call, Defendant Cohen stated the following, in relevant part:

During the past three months, I have identified several inefficiencies within our business that I believe have hindered iRobot's ability to maximize the potential of our powerful technology, brand, and consumer appeal. We had a high-cost product line that is now in the process of being refreshed in order to enhance our competitiveness and improve our profitability. At the same time, we had an organizational structure with too many layers that was built for a much larger company and that slowed decision making. Additionally, the R&D model carried too much overhead in high-cost countries for too many non-core ideas.
Our restructuring plan addresses all of these issues. Since I have joined, we have made several changes to our executive leadership team and reorganized the R&D to be better aligned with our vision of how to deliver new products. In fact, I am pleased to announce Jeff Engel has officially joined iRobot as President and Chief Operating Officer, reporting to me. Jeff has been with iRobot for seven months as our Chief Restructuring Officer and Advisor. He will be responsible for R&D, operations and supply chain and product management, and will continue his duties as CRO, since our work in this area is not completed.

Jeff's willingness to join iRobot at this time and his faith in our turnaround speaks volumes to the company's growth prospects. And he has been instrumental in helping us deliver against our restructuring targets. Our second quarter results

demonstrate that our restructuring plan is on track and delivering the expected results. We have made tough but appropriate decisions to achieve our planned operating expense and headcount reduction targets. We have also reduced inefficient marketing spend and improved our product margins via our new contract manufacturing strategy.

* * *

As we navigate near-term headwinds, we remain confident in our ability to build on iRobot's legacy of innovation to advance our long-term growth initiatives. To that end, we have launched iRobot Elevate, which is a new strategy centered on improving our financial performance, increasing consumer focus to elevate our brand, bringing innovative products to market in an entirely new and more profitable way, continuing our operational and organization improvements, and developing and retaining our best talent.

* * *

Our near-term goal is to stabilize the business, improve the balance sheet and launch new products that set us on a path to revenue growth. I am confident in our turnaround plan, pleased with our early returns and energized by our future potential. Turnarounds are challenging, take time, energy and commitment. I have done it before, and I plan to do it again.

58.    On November 5, 2024, the Company hosted an earnings call to discuss its financial results for the third quarter of 2024. During the call, Defendant Cohen stated the following, in relevant part:

As we begin this new chapter in iRobot's history, one thing is abundantly clear. We have a powerful brand that will serve as the foundation for the turnaround of this company. Which should come as no surprise that in my conversations with stakeholders, it is the power of our iconic brand that comes up again and again. That brand power is at the heart of our turnaround strategy, iRobot Elevate.

In executing iRobot Elevate, we are focused on providing our iconic brand with an improved platform to return to profitable growth. We are making operational and organizational changes and bringing new innovative products to market. While this work is ongoing, we are already realizing benefits and our improved financial performance. We recognize that turnarounds of this scale take time, but I am encouraged by our progress toward the goals that we set in February.

* * *

25

But even in our current turnaround, iRobot continues to be the leader in several segments and we remain confident that as we aggressively introduce new robots with more features and enhanced capabilities, our share and sales volume will rebound. And consumers remain loyal to the Roomba brand. In fact, in a recent promotion with one of our major retailers, iRobot had four of the top five SKUs in the robot vacuum cleaner category. We still have work-in front of us to become a more agile growth business, but our culture of innovation remains strong and I believe that we can achieve our growth and value creation goals. I see incredible opportunities for this company and we are optimistic about our prospects in 2025. This optimism is based on our expectations regarding the growth in the robotic floor care category as a whole, as well as success from our own new product programs.

\* \* \*

In closing, we are mindful of the market and operational challenges ahead and believe our actions will elevate iRobot's overall performance and ultimately generate long-term growth and shareholder value.

59.    On November 6, 2024, iRobot issued a press release announcing its financial results

for the third quarter of 2024, stating the following, in relevant part:

"We continue to make progress on our turnaround strategy," said [Defendant] Cohen[.] "In the third quarter, we expanded our non-GAAP gross margin by 590 basis points year over year and improved our use of operating cash. However, our overall results did not meet the expectations we set in August, as persistent market segment and competitive headwinds impacted our sell-through performance. Although we now expect it will take more time to stabilize our revenue trend, we are on track to exceed our operating expense targets for the year, while at the same time continuing to invest in areas that are expected to drive growth.

"Our ongoing restructuring has fundamentally changed the way we innovate, develop and build our robots, which is central to improving our performance and generating long-term shareholder value. With the benefit of lower operating costs, we expect to enhance margins and improve profitability in 2025.

As we move forward in this new chapter in iRobot's history, one thing is abundantly clear: we have a powerful brand that will serve as the foundation for the turnaround of this Company. That brand power is at the heart of our turnaround strategy, iRobot Elevate. In executing that strategy, we are focused on providing our iconic brand with an improved platform to drive long-term profitable growth."

\* \* \*

26

Fourth-Quarter and Full-Year 2024 Outlook

iRobot is providing GAAP and non-GAAP financial expectations for the fourth quarter ending December 28, 2024 and updating the full-year 2024 outlook it provided on August 7, 2024.

* * *

*Fourth Quarter 2024:*

| Metric | GAAP | Adjustments | Non-GAAP |
|---|---|---|---|
| Revenue | $175 – $200 million | — | $175 – $200 million |
| Gross Margin | 24% – 27% | ~0% | 24% – 27% |
| Operating Loss | ($43) – ($34) million | ~$12 million | ($31) – ($22) million |
| Net Loss Per Share | ($1.88) – ($1.58) | ~$0.38 | ($1.50) – ($1.20) |

60.    On January 13, 2025, iRobot issued a press release announcing its financial results for the fourth quarter of 2024, stating the following, in pertinent part:

"We have fundamentally changed the way we innovate, develop and build our robots, which is central to our strategy for improving financial performance and generating long-term shareholder value," [Defendant] Cohen said. "We exceeded our 2024 operating expense restructuring targets while we are investing in areas that are expected to drive growth. We remain on schedule with our product launches planned for 2025 that are designed to excite consumers with feature-rich robots and improve the consumer product experience."

For the full year 2025, iRobot currently expects to return to year-over-year topline growth as it introduces new and revitalized products. The Company expects. the second half of 2025 will be stronger than the first half of the year as its product lineup ramps up. The Company expects first-quarter 2025 results will continue to reflect a transitional period for its product line. With the benefit of lower product costs and reduced development timelines, iRobot expects enhanced margins and improved profitability in 2025. iRobot will be sharing additional details, including its outlook for 2025, on its fourth-quarter and year-end 2024 conference call.

61.    The statements identified in ¶¶ 47-59 were materially false and misleading and

omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (1) the Company overstated the effectiveness of its restructuring plan in preserving the Company's stability following the termination of the Amazon Acquisition; (2) following the termination of the Amazon Acquisition, the Company was unlikely to sustain profitable operations; and (3) as a result, there existed significant doubt as to its ability to continue as a going concern.

### *The Truth Emerges*

62.    On March 12, 2025, iRobot issued a press release announcing its financial results for the fourth quarter and full 2024 fiscal year. The press release stated the following, in relevant part:

> As will be noted in iRobot's Annual Report on Form 10-K for the year ended December 28, 2024 (10-K), there can be no assurance that the new product launches will be successful due to potential factors, including, but not limited to consumer demand, competition, macroeconomic conditions, and tariff policies. Given these uncertainties and the implication they may have on the Company's financials, there is substantial doubt about the Company's ability to continue as a going concern for a period of at least 12 months from the date of the issuance of its consolidated 2024 financial statements. Additional information will be included in the 10-K that is filed with the SEC.

> * * *

> Fourth-Quarter and Full-Year 2024 Conference Call

> In light of these developments, the Company has canceled its fourth-quarter and full-year 2024 results conference call and webcast, originally scheduled for today, March 12, 2025 at 8:30 a.m. ET, and is not providing a 2025 outlook at this time.

63.    The market was quick to react to the disclosures. That same day, March 12, 2025, *The Motley Fool* published an article titled "Why iRobot Stock Is Crashing Today," which stated, in relevant part:

> iRobot [. . .] stock has fallen 35% after the company issued a "going concern"

warning, raising doubts about its ability to stay in business over the next year.

\* \* \*

A business model under pressure

iRobot is struggling to keep up with rising competition, especially from lower-cost Chinese robotic vacuum manufacturers. These rivals offer similar or better features at reduced prices, eroding iRobot's once-dominant position.

Meanwhile, iRobot's costly restructuring efforts -- including a 50% workforce reduction -- have yet to yield stability. The company has also been dealing with excess inventory write-offs, further damaging its margins.

\* \* \*

In a desperate bid to regain its footing, iRobot has launched eight new Roomba models, touting lidar navigation and improved mapping technology. However, the company's financial turmoil has overshadowed this product push, leaving investors skeptical.

\* \* \*

What's next for iRobot?

With no clear path to profitability, iRobot has hired financial advisors to explore strategic alternatives, including a potential sale or refinancing. However, it remains unclear whether these efforts will be enough to restore investor confidence.

64.    On this news, the price of iRobot stock declined more than 51% over the following two days, from a closing price of $6.31 per share on March 11, 2025 to a closing price of $3.06 per share on March 13, 2025.

### THE PROXY DEFENDANTS CAUSED THE COMPANY TO ISSUE FALSE AND MISLEADING PROXY STATEMENTS

65.    On April 9, 2024, iRobot filed a proxy statement on Schedule 14A with the SEC (the "2024 Proxy Statement"). The 2024 Proxy Statement was solicited by Defendants Weinstein, Golz, Kao, Manolis, Miller, and Stacy and sought shareholder approval for, *inter alia*, the re-

election of Defendant Manolis to the Board and the compensation of certain of the Company's

executive officers, including Defendants Zeiler and Weinstein.

66.    In regards to the Company's risk management function, the 2024 Proxy Statement

stated the following, in relevant part:

> The board of directors oversees our risk management process. This oversight is primarily accomplished through the board of directors' committees and management's reporting processes, including receiving regular reports from members of senior management on areas of material risk to the Company, including operational, financial, legal and regulatory, and strategic and reputational risks. The audit committee focuses on risk related to accounting, internal controls, financial and tax reporting, privacy and cybersecurity. The audit committee also assesses economic and business risks and monitors compliance with ethical standards. The compensation and talent committee identifies and oversees risks associated with our executive compensation policies and practices, and the nominating and corporate governance committee identifies and oversees risks associated with director independence, related party transactions and the implementation of corporate governance policies.

67.    In regards to the Company's internal controls and public disclosure

requirements, the 2024 Proxy Statement stated the following, in relevant part:

> The audit committee oversees the Company's accounting and financial reporting processes on behalf of the board of directors. The meetings of the audit committee are designed to facilitate and encourage communication among the audit committee, Company management, the independent registered public accounting firm and the Company's internal audit function. The Company's management has the primary responsibility for the financial statements, for maintaining effective internal control over financial reporting, and for assessing the effectiveness of internal control over financial reporting. In fulfilling its oversight responsibilities, the audit committee has reviewed and discussed with management the Company's consolidated financial statements for the fiscal quarters and full year ended December 30, 2023, including a discussion of, among other things, the quarterly and annual earnings press releases, the quality of the Company's accounting principles, the reasonableness of significant estimates and judgments, and the clarity of disclosures in the Company's financial statements.

68.    The 2024 Proxy Statement was materially false and misleading as it failed to

disclose that the Company was overstating the extent to which its restructuring plan would stabilize

its business in the wake of the termination of the Amazon Acquisition. Further, despite descriptions of the Board's and its committees oversight responsibilities with respect to the Company's internal controls and risk management function, the Board and its committees were failing to adequately fulfill these responsibilities and were causing and/or permitting the Company to issue the materially false and misleading statements detailed herein.

## DAMAGES TO IROBOT

69.     As a direct and proximate result of the Individual Defendants' misconduct, iRobot has expended and will continue to expend significant sums of money.

70.     Such expenditures include, but are not limited to, legal fees, costs, and amounts paid to outside lawyers, accountants, experts, and investigators in the Securities Class Action.

71.     Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

72.     As a direct and proximate result of the Individual Defendants' conduct, iRobot has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

73.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

74.     iRobot is named solely as a nominal party in this action. This is not a collusive

action to confer jurisdiction on this Court that it would otherwise not have.

75. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

76. Plaintiff is an owner of iRobot stock and has been a continuous holder of the Company's common shares at all relevant times.

77. A pre-suit demand on the Board is futile and therefore, excused. At the time this suit was filed, the Board consisted of the following seven individuals: Defendants Cohen, Golz, Loparco, Manolis, Miller, Mininberg, and Stacy (the "Director Defendants"). Plaintiff is required to show that a majority of directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, none of the Board's current directors are capable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

78. Each of the Director Defendants faces a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

79. The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly

approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

80.     The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

81.     Defendant Cohen has served as a Company director and as the Company's Chief CEO since May 2024. As such, Defendant Cohen receives significant compensation from the Company as detailed above. Defendant Cohen signed the 2023 Form 10-K and solicited the 2024 Proxy Statement, both of which contained false and misleading statements. As a Company Director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Cohen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

82.     Defendant Golz has served as a Company director since November 2021. As such, Defendant Golz receives significant compensation from the Company as detailed above. Defendant Golz signed the 2023 Form 10-K and solicited the 2024 Proxy Statement, both of which contained false and misleading statements. As a Company Director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements,

consciously disregarded her duties to monitor controls over reporting, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Golz breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

83.    Defendant Loparco has served as a Company director since August 2024. As such, Defendant Loparco receives significant compensation from the Company as detailed above. Defendant Loparco signed the 2023 Form 10-K and solicited the 2024 Proxy Statement, both of which contained false and misleading statements. As a Company Director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Loparco breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

84.    Defendant Manolis has served as a Company director since July 2019. As such, Defendant Manolis receives significant compensation from the Company as detailed above. Defendant Manolis signed the 2023 Form 10-K and solicited the 2024 Proxy Statement, both of which contained false and misleading statements. As a Company Director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor controls over reporting, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Manolis breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

85.    Defendant Miller has served as a Company director since September 2016 and as

Chairman of the Board since January 2024. As such, Defendant Miller receives significant compensation from the Company as detailed above. Defendant Miller signed the 2023 Form 10-K and solicited the 2024 Proxy Statement, both of which contained false and misleading statements. As a Company Director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

86.    Defendant Mininberg has served as a Company director since June 2024. As such, Defendant Mininberg receives significant compensation from the Company as detailed above. Defendant Mininberg signed the 2023 Form 10-K and solicited the 2024 Proxy Statement, both of which contained false and misleading statements. As a Company Director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Mininberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

87.    Defendant Stacy has served as a Company director since August 2014. As such, Defendant Stacy receives significant compensation from the Company as detailed above. Defendant Stacy signed the 2023 Form 10-K and solicited the 2024 Proxy Statement, both of which contained false and misleading statements. As a Company Director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements,

consciously disregarded her duties to monitor controls over reporting, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Stacy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

88.     Defendants Golz, Miller, and Mininberg either serve, or served during the Relevant Period, as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent or correct the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices as alleged above. Therefore, Golz, Miller, and Mininberg cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

89.     The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct, which goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to iRobot's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

90.     The Director Defendants' conduct described herein and summarized above could

not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

91.    The Director Defendants may be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of iRobot. If there is a liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of iRobot, there would be no insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

92.    If there is no liability insurance, then the Director Defendants will not cause iRobot to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

93.    Accordingly, for all of the reasons set forth above, all of the current directors cannot

consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## **COUNT ONE**

**Against the Proxy Defendants for Violations of Section 14(a) of the Exchange Act**

94.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

95.     The Proxy Defendants solicited the 2024 Proxy Statement containing materially false and misleading statements and/or omissions.

96.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

97.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a- 9.

98.     The 2024 Proxy Statement failed to disclose that: (1) the Company overstated the effectiveness of its restructuring plan in preserving the Company's stability following the termination of the Amazon Acquisition; (2) following the termination of the Amazon Acquisition,

38

the Company was unlikely to sustain profitable operations; and (3) as a result, there existed significant doubt as to its ability to continue as a going concern.

99.     In exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination.

100.    The Company was damaged as a result of the Proxy Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

101.    Plaintiff on behalf of iRobot has no adequate remedy at law.

## COUNT TWO

### Against the Individual Defendants for Breach of Fiduciary Duties

102.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

103.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of iRobot's business and affairs.

104.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

105.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of iRobot.

106.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

39

107.    In further breach of their fiduciary duties owed to iRobot, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company overstated the effectiveness of its restructuring plan in preserving the Company's stability following the termination of the Amazon Acquisition; (2) following the termination of the Amazon Acquisition, the Company was unlikely to sustain profitable operations; and (3) as a result, there existed significant doubt as to its ability to continue as a going concern.

108.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

109.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

110.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the

Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

111.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

112.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, iRobot has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

113.    Plaintiff on behalf of iRobot has no adequate remedy at law.

## COUNT THREE

### Against the Individual Defendants for Unjust Enrichment

114.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

115.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, iRobot.

116.    The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from iRobot that was tied to the performance or artificially-inflated valuation of iRobot or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

41

117.    Plaintiff, as a shareholder and a representative of iRobot, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

118.    Plaintiff on behalf of iRobot has no adequate remedy at law.

### COUNT FOUR

**Against the Individual Defendants for Waste of Corporate Assets**

119.    Plaintiff incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

120.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

121.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (1) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed, *supra*; (2) awarding self-interested stock options to certain officers and directors; and (3) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

122.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

123.    Plaintiff, on behalf of iRobot, has no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants, jointly and severally, and in favor of the Company, all losses and damages sustained by the Company as a result of the acts and transactions complained of herein, together with pre-judgment interest, in a fashion that ensures the Individual Defendants do not participate therein or benefit thereby;

C.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon;

D.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.    Awarding punitive damages;

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 18, 2025                    **THE ROSEN LAW FIRM, P.A.**

_/s/ Phillip Kim_
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

_Counsel for Plaintiff_

## <u>VERIFICATION</u>

        I, Charles Gaudreault am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

9/10/2025

Charles Gaudreault